**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| CITY OF LAKE CHARLES,<br><br>Plaintiff,<br><br>v.<br><br>3M COMPANY (f/k/a Minnesota Mining and Manufacturing Co.); AGC CHEMICALS AMERICAS INC.; AGC, INC. (f/k/a Asahi Glass Co., Ltd.); ARCHROMA MANAGEMENT, LLC; ARCHROMA U.S., INC., ARKEMA, INC.; BASF CORPORATION; BUCKEYE FIRE EQUIPMENT COMPANY; CARRIER GLOBAL CORPORATION; CHEMDESIGN PRODUCTS, INC.; CHEMGUARD, INC.; CHEMICALS INCORPORATED; CHUBB FIRE, LTD.; CLARIANT CORPORATION; CORTEVA, INC.; DEEPWATER CHEMICALS, INC.; JOHN DOE DEFENDANTS 1-49; DUPONT DE NEMOURS, INC.; DYNAX CORPORATION; E. I. DUPONT DE NEMOURS AND COMPANY; KIDDE PLC, INC.; KIDDE-FENWAL, INC.; NATION FORD CHEMICAL COMPANY; NATIONAL FOAM, INC.; RAYTHEON TECHNOLOGIES CORPORATION (f/k/a United Technologies Corporation); THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; TYCO FIRE PRODUCTS LP; and UTC FIRE & SECURITY AMERICAS CORPORATION, INC.,<br><br>Defendants. | MDL No.: 2873<br><br>Master Docket No.: 2:18-mn-2873-RMG<br><br>JUDGE RICHARD GERGEL<br><br>Civil Case No.:  2:22-cv-4525-RMG<br><br>DIRECT FILED COMPLAINT AND JURY DEMAND PURSUANT TO CASE MANAGEMENT ORDER NO. 3 |

<u>**PLAINTIFF'S ORIGINAL COMPLAINT**</u>

Plaintiff, the City of Lake Charles ("Plaintiff"), by and through its undersigned counsel, brings this action against Defendants, 3M Company (f/k/a Minnesota Mining and Manufacturing Co.), E. I. DuPont De Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, DuPont de Nemours, Inc., Corteva, Inc., Chemguard, Inc., Tyco Fire Products LP (individually and as successor-in-interest to The Ansul Company), Kidde-

1

Fenwal, Inc., Kidde PLC, Inc., Chubb Fire, Ltd., UTC Fire & Security Americas Corporation, Inc.,

Carrier Global Corporation, Raytheon Technologies Corporation (f/k/a United Technologies

Corporation), National Foam, Inc., Buckeye Fire Equipment Company, Arkema, Inc., BASF

Corporation, ChemDesign Products, Inc., Clariant Corporation, Chemicals Incorporated, Nation

Ford Chemical Company, AGC Chemicals Americas, Inc., AGC, Inc. (f/k/a Asahi Glass Co., Ltd.),

Deepwater Chemicals, Inc., Dynax Corporation, Archroma Management, LLC, Archroma U.S.,

Inc., and John Doe Defendants 1-49 (collectively, "Defendants"), and alleges as follows:

## SUMMARY OF THE CASE

1.      Plaintiff brings this action against Defendants to recover any and all past and future

compensatory and/or consequential damages for the investigation, remediation, removal, disposal,

treatment, and monitoring of the ongoing contamination of its surface water, groundwater, soil,

and sediment caused and/or created by Defendants' products, diminished property value,

attorneys' fees and costs, as well as any and all other damages available as a result of the actions

and/or inactions of Defendants.

2.      Plaintiff is the governing authority of the City of Lake Charles, a municipality in

Calcasieu Parish, Louisiana.  Plaintiff is the owner and/or actual possessor of Chennault

International Airport and other relevant facilities and structures located thereon (collectively,

"Plaintiff's Property").

3.      Per- and polyfluoroalkyl substances ("PFAS"), including perfluorooctanoic acid

("PFOA") and perfluorooctane sulfonic acid ("PFOS"), have been discovered in the water and soil

at Plaintiff's Property.

4.    PFOA and PFOS are man-made compounds that are toxic and persistent in the environment, do not biodegrade, move readily through soil and groundwater, and pose a significant risk to human health and safety.

5.    At various times from the 1960s through today, Defendants designed, manufactured, formulated, marketed, distributed, and/or sold PFOA, PFOS, the chemical precursors of PFOA and/or PFOS, and/or aqueous film-forming foam ("AFFF") containing PFOA, PFOS and/or their chemical precursors (collectively, "Fluorosurfactant Products").

6.    AFFF is a firefighting agent used to control and extinguish Class B fuel fires and is used at sites such as military bases, airports, petroleum refineries, and fire training centers.

7.    Defendants designed, manufactured, marketed, distributed, sold, and/or acquired or assumed liabilities for the manufacture and/or sale of Fluorosurfactant Products with the knowledge that these toxic compounds would be released into the environment during fire protection, training, and response activities, even when used as directed and intended by the Defendants.

8.    Upon information and belief, at all times pertinent herein, Defendants' Fluorosurfactant Products have been released, used, stored, and/or disposed of at or near Plaintiff's Property for fire protection, training, and response activities.  During these activities, Defendants' Fluorosurfactant Products were stored, used, cleaned up, and/or disposed of as directed and intended by the Defendants, which allowed PFOS, PFOA, and/or their chemical precursors to enter the environment, and migrate through the soil, sediment, surface water, and groundwater, thereby contaminating Plaintiff's Property.

9.      As a result of the use of Defendants' Fluorosurfactant Products for their intended purpose, PFOS, PFOA, and/or their chemical precursors have been detected in the soil, sediment, surface water, and groundwater of Plaintiff's Property at substantial levels.

10.     Plaintiff's Property has been, and continues to be, contaminated by Defendants' Fluorosurfactant Products.

11.     At all times pertinent herein, Plaintiff did not know, nor should Plaintiff have known, of the ongoing contamination of its Property through the use, release, storage, and/or disposal of Defendants' Fluorosurfactant Products as Defendants did not disclose the toxic nature and harmful effects of these Fluorosurfactant Products.

12.     Through this action, Plaintiff seeks to recover compensatory and/or consequential damages for all past and future costs to investigate, remediate, remove, dispose of, treat, and monitor the PFOS and PFOA contamination of Plaintiff's Property caused by the use of Defendants' Fluorosurfactant Products on Plaintiff's Property, as well as any and all other damages recoverable under state and/or applicable federal laws. Plaintiff also seeks damages and restitution for the diminution of value of Plaintiff's Property, as well as reasonable attorneys' fees and costs.

## PARTIES

13.     Plaintiff is the governing authority of the City of Lake Charles, a municipality in Calcasieu Parish, Louisiana.  Plaintiff has the capacity to sue, and its principal address is located at 326 W Pujo St, Lake Charles, LA 70601.

14.     Upon information and belief, the following Defendants designed, manufactured, formulated, marketed, promoted, distributed, sold, and/or acquired or assumed liabilities for the manufacture and/or sale of the Fluorosurfactant Products that have and continue to contaminate Plaintiff's Property:

4

a.  Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a Delaware corporation authorized to conduct business in Louisiana, with its principal place of business located at 3M Center, St. Paul, Minnesota 55144. 3M is the only company that manufactured and/or sold AFFF containing PFOS in the United States, including Louisiana.

b.  Defendant E. I. DuPont De Nemours and Company ("DuPont") is a Delaware corporation with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.  DuPont is registered to do business in the State of Louisiana.

c.  Defendant The Chemours Company ("Chemours") is a Delaware corporation with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899.  Chemours is registered to do business in the State of Louisiana.

d.  In 2015, DuPont spun off its "Performance Chemicals" business to Chemours, along with certain environmental liabilities. Upon information and belief, at the time of the transfer of its Performance Chemicals business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries arising from the manufacture and sale of fluorosurfactants and the products that contain fluorosurfactants.

e.  Defendant The Chemours Company FC, LLC ("Chemours FC"), successor-in-interest to DuPont Chemical Solutions Enterprise, is a Delaware limited liability company with its principal place of business located at 1007 Market Street

Wilmington, Delaware, 19899. Chemours FC is registered to do business in the State of Louisiana.

f.  Defendant DuPont de Nemours, Inc. is a Delaware corporation with its principal place of business located at 974 Centre Road, Building 730, Wilmington, Delaware 19805. Upon information and belief, DowDuPont, Inc. was formed in 2017 as a result of the merger of Dow Chemical and DuPont. DowDuPont, Inc. was subsequently divided into three publicly traded companies and on June 1, 2019, DowDuPont, Inc. changed its registered name to DuPont de Nemours, Inc. ("New DuPont").

g.  Defendant Corteva, Inc. is a Delaware corporation with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. Upon information and belief, Corteva, Inc. is one of the aforementioned spin-off companies from DowDuPont, Inc., and is believed to have assumed some of the PFAS liabilities of the former DuPont. Corteva, Inc. is registered to do business in Louisiana.

h.  Defendant Chemguard, Inc. ("Chemguard") is a Texas corporation with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143. Chemguard is registered to do business in the State of Louisiana.

i.  Defendant Tyco Fire Products LP ("Tyco") is a Delaware limited partnership with its principal place of business located at 1400 Pennbrook Parkway, Lansdale, Pennsylvania 19446. Tyco acquired Chemguard in 2011. Tyco is a subsidiary of Johnson Controls International, plc, an Irish public limited company.

j.   Tyco is the successor-in-interest to The Ansul Company ("Ansul") and manufactures the Ansul brand of products (Ansul and/or Tyco as the successor-in-interest to Ansul will be referred to collectively as "Tyco/Ansul"). Upon information and belief, Tyco/Ansul does and/or has done business throughout the United States, including in the State of Louisiana.

k.   Defendant Kidde-Fenwal, Inc. ("Kidde") is a Delaware corporation with its principal place of business located at One Financial Plaza, Hartford, Connecticut 06101. Upon information and belief, Kidde was part of UTC Fire & Security Americas Corporation, Inc. Upon information and belief, Kidde-Fenwal, Inc. is the successor-in-interest to Kidde Fire Fighting, Inc. (collectively, "Kidde/Kidde Fire"). Upon information and belief, Kidde/Kidde Fire does and/or has done business throughout the United States, including in the State of Louisiana.

l.   Defendant Kidde PLC, Inc. is a Delaware corporation with its principal place of business located at 9 Farm Springs Road, Farmington, Connecticut 06032. Upon information and belief, Kidde PLC, Inc. was part of UTC Fire & Security Americas Corporation, Inc. Upon information and belief, Kidde PLC, Inc. does and/or has done business throughout the United States, including in the State of Louisiana.

m.   Defendant Chubb Fire, Ltd. ("Chubb") is a foreign private limited company, United Kingdom registration number 134210, with offices at Littleton Road, Ashford, Middlesex, United Kingdom TW15 1TZ. Upon information and belief, Chubb is or has been composed of different subsidiaries and/or divisions, including but not limited to, Chubb Fire & Security Ltd., Chubb Security, PLC, Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc. Upon information and belief, Chubb was part of UTC Fire & Security Americas Corporation, Inc.

n.  Defendant UTC Fire & Security Americas Corporation, Inc. ("UTC") is a Delaware corporation with its principal place of business at 13995 Pasteur Blvd., Palm Beach Gardens, Florida 33418.  Upon information and belief, UTC was a division of United Technologies Corporation.  UTC is registered to do business in Louisiana.

o.  Defendant Carrier Global Corporation is a Delaware corporation with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. Upon information and belief, UTC is now a division of Carrier.

p.  Defendant Raytheon Technologies Corporation (f/k/a United Technologies Corporation) ("Raytheon Tech f/k/a United Tech") is a Delaware corporation with its principal place of business at 10 Farm Springs Road, Farmington, Connecticut 06032. Upon information and belief, Raytheon Tech f/k/a United Tech does and/or has done business in Louisiana.

q.  Defendant National Foam, Inc. ("National Foam") is a Delaware corporation with its principal place of business located at 141 Junny Road, Angier, North Carolina 27501. National Foam is a subsidiary of Angus International Safety Group, Ltd. Upon information and belief, National Foam manufactures the Angus brand of AFFF products. National Foam does and/or has done business throughout the United States, including in the State of Louisiana.

r.  Defendant Buckeye Fire Equipment Company ("Buckeye") is an Ohio corporation with its principal place of business at 110 Kings Road, Mountain, North Carolina 28086.  Buckeye does and/or has done business throughout the United States, including in the State of Louisiana.

s.  Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation with its principal place of business at 900 1st Avenue, King of Prussia, Pennsylvania 19406. Arkema is registered to do business in Louisiana. Upon information and belief, Arkema, Inc. is the operating U.S. subsidiary of Arkema France, SA.

t.  Defendant BASF Corporation ("BASF") is a Delaware corporation with its principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932. Upon information and belief, BASF acquired Ciba-Geigy Corporation and/or Ciba Specialty Chemicals.  BASF is registered to do business in Louisiana.  Upon information and belief, Ciba-Geigy Corporation and/or Ciba Specialty Chemicals does and/or has done business throughout the United States, including Louisiana.

u.  Defendant ChemDesign Products, Inc. ("ChemDesign") is a Texas corporation with its principal place of business located at 2 Stanton Street, Marinette, Wisconsin 54143.   Upon information and belief, this Defendant manufactured Fluorosurfactant Products for use in AFFF sold throughout the United States, including in Louisiana.

v.  Defendant Clariant Corporation ("Clariant") is a New York corporation with its principal place of business located at 4000 Monroe Road, Charlotte, North Carolina 28205.  Clariant is registered to do business in Louisiana.

w.  Defendant Chemicals Incorporated ("Chem Inc.") is a Texas corporation with its principal place of business located at 12321 Hatcherville Road, Baytown, Texas 77521. Upon information and belief, this Defendant manufactured Fluorosurfactant Products for use in AFFF sold throughout the United States, including in Louisiana.

x.  Defendant Nation Ford Chemical Company ("Nation Ford") is a South Carolina corporation with its headquarters located at 2300 Banks Street, Fort Mill, South Carolina 29715. Upon information and belief, this Defendant manufactured Fluorosurfactant Products for use in AFFF sold throughout the United States, including in Louisiana.

y.  Defendant AGC Chemicals Americas, Inc. ("AGC America") is a Delaware corporation with its principal business office at 55 E. Uwchlan Avenue, Suite 201, Exton, Pennsylvania 19341.  Upon information and belief, AGC America is a subsidiary of AGC, Inc., a Japanese corporation formerly known as Asahi Glass Company, Ltd.  AGC America is registered to do business in Louisiana.

z.  Defendant AGC, Inc. f/k/a Asahi Glass Co., Ltd. ("AGC"), is a corporation organized under the laws of Japan and does business throughout the United States. AGC has its principal place of business at 1-5-1, Marunouchi, Chiyoda-ku, Tokyo 100-8405 Japan.

aa. Defendant Deepwater Chemicals, Inc. ("Deepwater") is a Delaware corporation with its principal place of business located at 196122 E County Road 40, Woodward, Oklahoma 73801. Upon information and belief, this Defendant manufactured Fluorosurfactant Products for use in AFFF sold throughout the United States, including in Louisiana.

bb. Defendant Dynax Corporation ("Dynax") is a Delaware corporation with its principal place of business located at 103 Fairview Park Drive, Elmsford, New York 10523. Upon information and belief, this Defendant manufactured

Fluorosurfactant Products for use in AFFF sold throughout the United States, including in Louisiana.

cc. Defendant Archroma Management, LLC, is a foreign limited liability company registered in Switzerland, with a principal business address of Neuhofstrasse 11, 4153 Reinach, Basel-Land, Switzerland.

dd. Defendant Archroma U.S., Inc. is a Delaware corporation with its principal place of business located at 5435 77 Center Dr., #10, Charlotte, North Carolina 28217. Upon information and belief, Archroma U.S., Inc. is a subsidiary of Archroma Management, LLC, and supplied Fluorosurfactant Products for use in AFFF. Archroma U.S., Inc. is registered to do business in Louisiana.

ee. Upon information and belief, Defendants John Doe 1-49 were designers, manufacturers, marketers, distributors, and/or sellers of Fluorosurfactant Products that have and continue to contaminate Plaintiff's Property. Although the identities of the John Doe Defendants are currently unknown, it is expected that their names will be ascertained during discovery, at which time Plaintiff will move for leave of this Court to add those individuals' actual names to the Complaint as Defendants.

15.     Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named Defendants.

16.     When the term "Defendants" is used alone, it refers to all Defendants named in this Complaint jointly and severally. When reference is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation,

or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because complete diversity exists between Plaintiff and Defendants, and the amount in damages exceeds the minimal jurisdictional limits of this Court.

18.     Venue is appropriate in this judicial district pursuant to this Court's Case Management Order No. 3 ("CMO 3"). Plaintiff states that but for CMO 3 permitting direct filing in the United States District Court for the District of South Carolina, Plaintiff would have filed this Complaint in the United States District Court for the Western District of Louisiana. Further, in accordance with CMO 3, Plaintiff hereby designates the United States District Court for the Western District of Louisiana as the "Home Venue" as this case may have originally been filed there.

19.     Venue is proper in the United States District Court for the Western District of Louisiana pursuant to 28 U.S.C. § 1391 because it is the judicial district in which Plaintiff is a resident and citizen, a substantial part of the property that is the subject of this action is situated in this judicial district, and a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## FACTUAL ALLEGATIONS

### A.  THE CONTAMINANTS: PFOA & PFOS

20.     PFOA and PFOS are man-made chemicals within a class known as perfluoroalkyl acid ("PFAA").  PFAAs are part of the larger chemical family known as per- and polyfluoroalkyl substances ("PFAS").  PFAA is composed of a chain of carbon atoms in which all but one of the

carbon atoms are bonded to fluorine atoms, and the last carbon atom is attached to a functional group. The carbon-fluorine bond is one of the strongest chemical bonds that occur in nature, which is a reason why these molecules are so persistent. PFOA and PFOS contain eight carbon-fluorine bonds. For this reason, they are sometimes referred to as "C8."

21.     PFOA and PFOS are highly water soluble, which increases the rate at which they spread throughout the environment, contaminating soil, groundwater, and surface water. Their mobility is made more dangerous by their persistence in the environment and resistance to biologic, environmental, or photochemical degradation.[1]

22.     PFOA and PFOS are readily absorbed in animal and human tissues after oral exposure and accumulate in the serum, kidney, and liver. They have been found globally in water, soil, air, as well as in human food supplies, breast milk, umbilical cord blood, and human serum.[2]

23.     PFOA and PFOS are persistent in the human body. A short-term exposure can result in a body burden that persists for years and can increase with additional exposures.[3]

24.     Since they were first produced, information has emerged showing negative health effects caused by exposure to PFOA and PFOS.

25.     According to the United States Environmental Protection Agency ("EPA"), "…studies indicate that exposure of PFOA and PFOS over certain levels may result in…developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations), cancer (e.g., testicular, kidney), liver effects (e.g.,

---

[1] *See* EPA, Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA), EPA Document Number: 822-R-16-005 (May 2016) at 16; and Drinking Water Health Advisory for Perfluorooctane Sulfonate (PFOS), EPA Document Number: 822-R-16-004 (May 2016) at 16, both available at https://www.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health-advisories-pfoa-and-pfos.

[2] *See* EPA Document Number: 822-R-16-005 (May 2016) at 18-20, 25-27; and EPA Document Number: 822-R-16-004 (May 2016) at 19-21, 26 28.

[3] *See* EPA Document Number: 822-R-16-005 (May 2016) at 55; and EPA Document Number: 822-R-16-004 (May 2016) at 55.

tissue damage), immune effects (e.g., antibody production and immunity), thyroid effects and other effects (e.g., cholesterol changes)."[4]

26.     EPA has also warned that "there is suggestive evidence of carcinogenic potential for PFOS."[5]

27.     EPA has noted that "drinking water can be an additional source [of PFOA/PFOS in the body] in the small percentage of communities where these chemicals have contaminated water supplies." In communities with contaminated water supplies, "such contamination is typically localized and associated with a specific facility, for example…an airfield at which [PFOA/PFOS] were used for firefighting."[6]

28.     EPA has issued Health Advisory Levels of 70 parts per trillion ("ppt") for PFOA and PFOS found in drinking water.  When both PFOA and PFOS are found in drinking water, the combined concentrations should not exceed 70 ppt.

**B.  AQUEOUS FILM-FORMING FOAM**

29.     AFFF is a type of water-based foam that was first developed in the 1960s to extinguish flammable liquid fuel fires at airports and military bases, among other places.

30.     The AFFF designed, manufactured, marketed, distributed, and/or sold by Defendants contained either or both PFOA and PFOS, or the chemical precursors to PFOA or PFOS.

---

[4] *See* "Fact Sheet PFOA & PFOS Drinking Water Health Advisories," EPA Document Number: 800-F-16-003, available at https://www.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health-advisories-pfoa-and-pfos.
[5] *See* "Health Effects Support Document for Perfluorooctane Sulfonate (PFOS)" U.S. Environmental Protection Agency Office of Water Health and Ecological Criteria Division, EPA Document Number: 822-R-16-002, available at https://www.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health-advisories-pfoa-and-pfos.
[6] *See* "Fact Sheet PFOA & PFOS Drinking Water Health Advisories," EPA Document Number: 800-F-16-003, available at https://www.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health-advisories-pfoa-and-pfos.

31.    PFOS and/or the chemical precursors to PFOS contained in 3M's AFFF were manufactured by 3M's patented process of electrochemical fluorination ("ECF").

32.    All other Defendants manufactured fluorosurfactants for use in AFFF through the process of telomerization.  Telomerization produced fluorotelomers, including PFOA and/or the chemical precursors to PFOA.

33.    AFFF can be made without PFOA, PFOS, or their precursor chemicals. Fluorine-free foams and short-chains foams do not release PFOA, PFOS, and/or their precursor chemicals into the environment.

34.    AFFF is used to extinguish fires that are difficult to fight, particularly fires that involve petroleum or other flammable liquids. AFFF is typically sprayed directly onto a fire, where it works by coating the ignited fuel source, preventing its contact with oxygen, and suppressing combustion.

35.    When used as the Defendants intended and directed, Defendants' AFFF releases PFOA, PFOS, and/or their precursor chemicals into the environment.

36.    Once PFOA and PFOS are free in the environment, these chemicals do not hydrolyze, photolyze, or biodegrade under typical environmental conditions and are extremely persistent in the environment. As a result of their persistence, they are widely distributed throughout soil, air, and groundwater.

37.    The use of Defendants' Fluorosurfactant Products as directed and intended by the Defendants allowed PFOA, PFOS, and/or their precursor chemicals to enter into and onto Plaintiff's Property where these compounds migrated through the subsurface and into the groundwater, thereby contaminating the surface water, soil, sediment, and groundwater, as well as causing other extensive and ongoing damage to Plaintiff's Property.

38.     Due to the chemicals' persistent nature, among other things, these chemicals have, and continue to cause injury and damage to Plaintiff's Property.

**C.  DEFENDANTS' KNOWLEDGE OF PFOA AND PFOS HAZARDS**

39.     On information and belief, by the early 1980s, Defendants knew, or reasonably should have known, among other things, that: (a) PFOA and PFOS are toxic; and (b) when sprayed in the open environment per the instructions given by the manufacturer, PFOA and PFOS readily migrate through the subsurface, mix easily with groundwater, resist natural degradation, render drinking water unsafe and/or non-potable, and can be removed from public drinking water supplies only at substantial expense.

40.     Defendants also knew or reasonable should have known that PFOA and PFOS could be absorbed into the lungs and gastrointestinal tract, potentially causing severe damage to the liver, kidneys, and central nervous system, in addition to other toxic effects, and that PFOA and PFOS are known carcinogens that cause genetic damage.

41.     In 1980, 3M published data in peer reviewed literature showing that humans retain PFOS in their bodies for years. Based on that data, 3M estimated it could take a person up to 1.5 years to clear just half of the accumulated PFOS from their body after all exposures had ceased.[7]

42.     By the early 1980s, the industry suspected a correlation between PFOS exposure and human health effects. Specifically, manufacturers observed bioaccumulation of PFOS in workers' bodies and birth defects in children of workers.

43.     In 1981, DuPont tested for and found PFOA in the blood of female plant workers in Parkersburg, West Virginia. DuPont observed and documented pregnancy outcomes in exposed

---

[7] *See* Letter from 3M to Office of Pollution Prevention and Toxics, EPA titled "TSCA 8e Supplemental Submission, Docket Nos. 8EHQ-0373/0374 New Data on Half Life of Perfluorochemicals in Serum," available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades.

workers, finding two of seven children born to female plant workers between 1979 and 1981 had birth defects—one an "unconfirmed" eye and tear duct defect, and one a nostril and eye defect.[8]

44.     Beginning in 1983, 3M documented a trend of increasing levels of PFOS in the bodies of 3M workers. In an internal memo, 3M's medical officer warned "we must view this present trend with serious concern. It is certainly possible that … exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."[9]

45.     Based on information and belief, in 2000, under pressure from the EPA, 3M announced that it was phasing out PFOS and U.S. production of PFOS; 3M's PFOS-based AFFF production did not fully phase out until 2002.

46.     From 1951, DuPont, and on information and belief, Chemours, designed, manufactured, marketed, and sold Fluorosurfactant Products, including Teflon nonstick cookware, and more recently PFAS feedstocks, such as Forafac 1157 N, for the use in the manufacture of AFFF products.

47.     Based on information and belief, in 2001 or earlier, DuPont manufactured, produced, marketed, and sold Fluorosurfactant Products and/or PFAS feedstocks to some or all of the AFFF product manufacturers for use in their AFFF products that were discharged into the environment and contaminated Plaintiff's Property.

48.     DuPont had been studying the potential toxicity of PFOA since at least the 1960s and knew that it was contaminating drinking water drawn from the Ohio River and did not disclose to

---

[8] *See* Memorandum "C-8 Blood Sampling Results, Births and Pregnancies," available at
http://www.ewg.org/research/dupont-hid-teflon-pollution-decades.
[9] *See* Memorandum "Organic Fluorine Levels," August 31, 1984, available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades.

the public or to government regulators what they knew about the substance's potential effects on humans, animals, or the environment.[10]

49.    By December 2005, the EPA uncovered evidence that DuPont concealed the environmental and health effects of PFOA, and the EPA announced the "Largest Environmental Administrative Penalty in Agency History."[11] The EPA fined DuPont for violating the Toxic Substances Control Act "Section 8(e)—the requirement that companies report to the EPA substantial risk information about chemicals they manufacture, process or distribute in commerce."[12]

50.    By July 2011, DuPont could no longer credibly dispute the human toxicity of PFOA, which it continued to manufacture. The "C8 Science Panel" created as part of the settlement of a class action over DuPont's releases from the Washington Works plant had reviewed the available scientific evidence and notified DuPont of a "probable link"[13] between PFOA exposure and the serious (and potentially fatal) conditions of pregnancy-induced hypertension and preeclampsia.[14] By October 2012, the C8 Science Panel had notified DuPont of a probable link between PFOA and five other conditions—high cholesterol, kidney cancer, thyroid disease, testicular cancer, and ulcerative colitis.

---

[10] *See, e.g.,* Fred Biddle, "DuPont confronted over chemical's safety," *Wilmington News Journal* (Apr. 13, 2003). The *Wilmington News Journal* is published in Wilmington, Ohio.

[11] $16.5 million.

[12] U.S.Envtl. Prot. Agency, Reference News Release, "EPA Settles PFOA Case Against DuPont for Largest Environmental Administrative Penalty in Agency History" (Dec. 14, 2005), https://www.epa.gov/enforcement/reference-news-release-epa-settles-pfoa-case-against-dupont-largest-environmental (last viewed on January 30, 2018).

[13] Under the settlement, "probable link," means that given the available scientific evidence, it is more likely than not that among class members a connection exists between PFOA/C8 exposure and a particular human disease.

[14] *See* The C8 Science Panel, Status Report: PFOA (C8) exposure and pregnancy outcome among participants in the C8 Health Project (July 15, 2011), http://www.c8sciencepanel.org/pdfs/Status_Report_C8_and_pregnancy_outcome_15July2011.pdf (last viewed on January 28, 2018).

51.     In July 2015, DuPont spun off its chemicals division by creating Chemours as a new publicly-traded company, once wholly owned by DuPont. By mid-2015, DuPont had dumped its perfluorinated chemical liabilities into the lap of the new Chemours.

52.     Notwithstanding this knowledge, Defendants negligently and carelessly: (1) designed, manufactured, marketed, distributed, and/or sold Fluorosurfactant Products; (2) issued instructions on how Fluorosurfactant Products should be used and disposed of (namely, by washing the foam into the soil or wastewater system), thus improperly permitting PFOA and/or PFOS to contaminate the surface water, soil, and groundwater in and around the Plaintiff's Property; (3) failed to recall and/or warn the users of Fluorosurfactant Products, negligently designed products containing or degrading into PFOA and/or PFOS, of the dangers of surface water, soil, and groundwater contamination as a result of standard use and disposal of these products; and (4) further failed and refused to issue the appropriate warnings and/or recalls to the users of Fluorosurfactant Products, notwithstanding the fact that Defendants knew the identity of the purchasers of the Fluorosurfactant Products.

53.     As a direct result of Defendants' actions and/or inactions alleged in this Complaint, Plaintiff's Property has been and will continue to be contaminated with PFAS, including PFOA and PFOS, creating an environmental hazard, unless such contamination is remediated. As a direct and proximate result of Defendants' actions and/or inactions, Plaintiff must assess, evaluate, investigate, monitor, remove, clean up, correct, treat, and remediate PFOA and PFOS contamination on its Property at significant expense, loss, and damage.

54.     Defendants had a duty and breached their duty to evaluate and test such Fluorosurfactant Products adequately and thoroughly to determine their potential human health

and environmental impacts before they sold such products. They also had a duty and breached their duty to minimize the environmental harm caused by Fluorosurfactant Products.

### D. OLD DUPONT'S FRAUDULENT PLANS TO SHIELD ITS ASSETS FROM ITS PFAS LIABILITIES

55.     By 2013, Old DuPont faced mounting liabilities arising out of its long-running manufacture, use, marketing, distribution, and sale of PFOA and/or its chemical precursors throughout the country. These liabilities included, among other things, clean-up costs, remediation obligations, tort damages, natural resources damages, and potential punitive damages.

56.     Upon information and belief, by 2013, in order to shield its assets from these liabilities and make itself a more appealing merger partner, Old DuPont began to consider and/or engage in a complex series of corporate restructurings and spin-offs.

57.     In or around 2014, Old DuPont formed The Chemours Company as a wholly-owned and operated subsidiary. Shortly thereafter, Old DuPont transferred its "Performance Chemicals" business (which included Teflon® and other products, the manufacture of which involved the use of PFOA and other PFAS) to Chemours.

58.     At the time of the transfer of its Performance Chemicals business to Chemours, Old DuPont had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding Old DuPont's liabilities for damages and injuries arising from its manufacture and sale of its PFAS products, including PFOA and its chemical precursors.

59.     Upon information and belief, prior to the spinoff, Chemours was a wholly-owned subsidiary of Old DuPont and its four-member Board of Directors consisted of three Old DuPont employees and a former member of Old DuPont's Board of Directors. Then, effective immediately prior to the spinoff, the Chemours Board of Directors doubled in size, the three Old DuPont

employees resigned, and seven new members were appointed to fill the vacancies. This new Chemours Board of Directors did not take part in negotiating the Separation Agreement.

60.     In or around July 1, 2015, Old DuPont completed the spin-off Chemours as a separate public entity and saddled Chemours with Old DuPont's massive PFAS liabilities.

61.     Although many of the details of the Separation Agreement remain largely hidden from the public, upon information and belief, as part of the Separation Agreement, Chemours accepted broad assumption of Old DuPont's environmental liabilities arising out of its long-running manufacture, use, discharge, marketing, distribution, and sale of PFAS.

62.     Additionally, Chemours agreed to assume for itself and indemnify Old DuPont against all liabilities relating to or arising from the operation of the Performance Chemicals business at any time and regardless of which entity is named in any action or against whom such liabilities are asserted or determined.

63.     Further, Chemours agreed to assume for itself and indemnify Old DuPont from all environmental liabilities that arose prior to the spinoff if Old DuPont reasonably determined that 50.1% of the liabilities were attributable to the Performance Chemicals business.

64.     Upon information and belief, the value of the assets Chemours transferred to Old DuPont was substantially more than the value of the assets it received from Old DuPont, and Chemours assumed billions of dollars of Old DuPont's PFAS and other liabilities.

65.     Old DuPont knew that Chemours was undercapitalized and unable to satisfy the massive liabilities that it assumed from Old DuPont. In addition to the assumption of such liabilities, Chemours was required to provide broad indemnification to Old DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

66. In or around December 2015, Old DuPont entered into an agreement with Dow, Inc. ("Old Dow") pursuant to which Old DuPont and Old Dow merged with subsidiaries of a newly formed holding company, DowDuPont, Inc. ("DowDuPont"), which was created solely for the purpose of effectuating the merger. Old DuPont and Old Dow became subsidiaries of DowDuPont.

67. Following its creation, DowDuPont engaged in a number of realignments and divestitures, the details of which remain largely hidden from Plaintiff and other creditors, intended to frustrate and/or hinder creditors with claims against Old DuPont. Upon information and belief, the net effect of these transactions was the transfer, directly or indirectly, of a substantial portion of Old DuPont's assets to DowDuPont for far less than these assets were worth.

68. By 2019, DowDuPont spun-off two new publicly traded companies, Corteva, Inc. and Dow, Inc. ("New Dow"). DowDuPont was then renamed DuPont de Nemours, Inc. ("New DuPont").

69. Upon information and belief, Corteva currently holds Old DuPont as a subsidiary.

70. Upon information and belief, as part of the DowDuPont Separation Agreement, Corteva and New DuPont also assumed direct financial liability of Old DuPont that was not related to the Agriculture, Material Science, or Specialty Products Businesses, including the PFAS liabilities which are allocated on a pro rata basis between Corteva and New DuPont.

**E.  THE IMPACT OF PFOA AND PFOS ON PLAINTIFF'S PROPERTY**

71. PFOA and PFOS have been detected in soil and water extracted from Plaintiff's Property.  PFOA and PFOS have been detected and/or are present in certain of areas of Plaintiff's Property.  The detection and/or presence of PFOA and PFOS, and the threat of further detection and/or presence of PFOA and PFOS, in Plaintiff's Property has resulted, and will continue to result, in significant injuries and damage to Plaintiff.

72.     Upon information and belief, the invasion of Plaintiff's Property with PFOA and PFOS is recurring, resulting in new harm to Plaintiff on each occasion.

73.     The injuries to Plaintiff caused by Defendants' conduct constitute an unreasonable interference with, and damage to, Plaintiff and Plaintiff's Property. Plaintiff's interests in protecting its Property constitute a reason for seeking damages sufficient to restore such Property to its pre-contamination condition, in addition to the other damages sought herein.

## **FIRST CAUSE OF ACTION**

STRICT LIABILITY – DEFECTIVE DESIGN

74.     Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

75.     Defendants were engaged in the business of researching, designing, manufacturing, testing, distributing, marketing, and/or selling Fluorosurfactant Products.

76.     Defendants manufactured, marketed and/or sold Fluorosurfactant Products for use in controlling and extinguishing aviation, marine, fuel, and other flammable liquid fuel fires.

77.     Plaintiff was harmed by Fluorosurfactant Products which were designed, manufactured, marketed, sold and/or distributed by Defendants, and which were defectively designed, did not include sufficient instructions, and did not include sufficient warning of potential safety hazards.

78.     Defendants' Fluorosurfactant Products did not perform as safely as an ordinary consumer would have expected them to perform when used or misused in an intended or reasonably foreseeable way.

79.     Defendants represented, asserted, claimed and/or warranted that their Fluorosurfactant Products could be used in conformity with accompanying instructions and labels in a manner that would not cause injury or damage.

80.     As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers, and marketers of Fluorosurfactant Products, Defendants owed a duty to all persons whom Defendants' products might foreseeably harm, including Plaintiff, not to manufacture, sell, or market any product which is unreasonably dangerous for its intended and foreseeable uses.

81.     Defendants' Fluorosurfactant Products used on or in the vicinity of Plaintiff's Property were used in a reasonably foreseeable manner and without substantial change in the condition in which the products were sold.

82.     Defendants knew, or should have known, that use of Defendants' Fluorosurfactant Products in their intended manner would result in the spillage, discharge, disposal, or release of PFOA and/or PFOS into the surface water, soil, and groundwater.

83.     Furthermore, Defendants knew or should have known that their Fluorosurfactant Products were toxic, could not be contained, and do not readily degrade in the environment.

84.     Defendants' Fluorosurfactant Products used on Plaintiff's Property were defective in design and unreasonably dangerous because, among other things: (a) PFOA and PFOS cause soil and water contamination, even when used in their foreseeable and intended manner; (b) even at extremely low levels, PFOA and PFOS render drinking water unfit for consumption; (c) PFOA and PFOS pose significant threats to public health; and (d) PFOA and PFOS create real and potential threat to the environment.

85.     Plaintiff was, is and will continue to be harmed by Defendants' defectively designed Fluorosurfactant Products.

86.     As a direct and proximate result of Defendants' above described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of its Property, including but not limited to the investigation, monitoring, treatment,

testing, remediation, removal, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, legal fees, and diminished property value.

## SECOND CAUSE OF ACTION

### STRICT LIABILITY – FAILURE TO WARN

87.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

88.    As manufacturers, distributors, suppliers, sellers, and marketers of Fluorosurfactant Products, Defendants had a duty to issue warnings to Plaintiff, the public, water providers, and public officials of the risks posed by PFOA and PFOS.

89.    Defendants knew that their Fluorosurfactant Products would be purchased, transported, stored, handled, and used without notice of the hazards that PFOA and PFOS pose to human health and the environment.

90.    Defendants breached their duty to warn by unreasonably failing to provide Plaintiff, public officials, purchasers, downstream handlers, and/or the general public with warnings about the potential and/or actual contamination of the environment by PFOA and PFOS, despite Defendants' knowledge that PFOA and PFOS were real and potential threats to the environment.

91.    Fluorosurfactant Products purchased or otherwise acquired from Defendants were used, discharged, and/or released at and/or in the vicinity of Plaintiff's Property.

92.    Defendants' Fluorosurfactant Products were used in a reasonably foreseeable manner and without substantial changes in the condition in which the products were sold.

93.    Defendants' Fluorosurfactant Products used on and/or in the vicinity of Plaintiff's Property were defective in design and unreasonably dangerous for the reasons set forth above.

94.    Despite the known and/or foreseeable environmental and human health hazards associated with the use and/or disposal of Defendants' Fluorosurfactant Products on or near

Plaintiff's Property, including contamination of Plaintiff's Property with PFOA and/or PFOS, Defendants failed to provide adequate warnings of, or take any other precautionary measures to mitigate, those hazards.

95.     In particular, Defendants failed to describe such hazards or provide any precautionary statements regarding such hazards in the labeling of their Fluorosurfactant Products.

96.     As a direct and proximate result of Defendants' above described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of its Property, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, legal fees, and diminished property value.

## THIRD CAUSE OF ACTION

### NUISANCE

97.     Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

98.     Defendants designed, manufactured, distributed, marketed, and/or sold their Fluorosurfactant Products in a manner that created, or participated in creating, a nuisance that unreasonably endangers or injures the property of the Plaintiff, causing inconvenience and annoyance.

99.     Defendants, by their acts and omissions set forth above have, among other things, knowingly unleashed long-lasting and ongoing PFOA and/or PFOS contamination and threat of contamination to Plaintiff's Property.

100.     Actual and threatened PFOA and/or PFOS contamination caused by Defendants' conduct has caused, and continues to cause, injury to Plaintiff in the form of present and serious

interference with the use, benefit, and/or enjoyment of its Property in a way that an ordinary, reasonable person would find is a substantial inconvenience and annoyance.

101.    Defendants' conduct has also injured and continues to injure the property which thereby injures and/or threatens the health, safety, and/or comfort of aspects of the property as a place of business operations.

102.    Defendants knew or, in the exercise of reasonable care, should have known that the use and introduction of their Fluorosurfactant Products into the environment would and has continuously, unreasonably, and seriously endangered and interfered with the ordinary safety, use, benefit, and enjoyment of Plaintiff's Property by Plaintiff.

103.    As a direct and proximate result of Defendants' above described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of its Property, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, legal fees, and diminished property value.

## **FOURTH CAUSE OF ACTION**

### TRESPASS

104.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

105.    Plaintiff is the administrator, operator and/or actual possessor of Plaintiff's Property **and other relevant structures located thereon with the obligation to maintain, operate, and supervise Plaintiff's property and the authority to sue relative thereto.  Defendants knew, or in the exercise of reasonable care should have known, that PFOA and/or PFOS contaminates soil, surface, and groundwater, including the property and other rights of Plaintiff.

106.     Defendants failed to properly warn against the use of Fluorosurfactant Products such that they proximately caused and continue to cause PFOA and/or PFOS to contaminate Plaintiff's Property, including but not limited to its soil, sediment, surface water, groundwater, and other structures located thereon.

107.     The contamination of Plaintiff's Property has varied over time and has not yet ceased. PFOA and/or PFOS continue to migrate onto and enter Plaintiff's Property. The contamination is reasonably abatable.

108.     Plaintiff has not consented to, and does not consent to, this trespass or contamination.

109.     Defendants knew or reasonably should have known that Plaintiff would not consent to this trespass.

110.     Plaintiff was, is, and will continue to be harmed by the entry of Defendants' Fluorosurfactant Products onto its Property.

111.     As a direct and proximate result of Defendants' above described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of its Property, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, legal fees, and diminished property value.

## FIFTH CAUSE OF ACTION

NEGLIGENCE

112.     Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

113.     As manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers, and/or handlers of Fluorosurfactant Products, Defendants owed a duty to Plaintiff, as well as to all persons whom Defendants' Fluorosurfactant Products might foreseeably harm, to

exercise due care in the instructing, labeling, and warning of the handling, control, use, and disposal of Defendants' Fluorosurfactant Products.

114.    Despite the fact that Defendants knew that PFOA and PFOS are toxic, can contaminate soil and water resources, and present significant risks to human health and the environment, Defendants negligently: (a) designed, manufactured, formulated, handled, labeled, instructed, controlled, marketed, promoted, and/or sold Fluorosurfactant Products; (b) issued instructions on how Fluorosurfactant Products should be used and disposed of, thus improperly permitting PFOA and/or PFOS to enter and contaminate Plaintiff's Property; (c) failed to recall and/or warn the users of Fluorosurfactant Products of the dangers of soil and water contamination as a result of standard use and disposal of these products; and (d) failed and refused to issue the appropriate warnings and/or recalls to the users of Fluorosurfactant Products regarding the proper use and disposal of these products, notwithstanding the fact that Defendants knew, or could determine with reasonable certainty, the identity of the purchasers of their Fluorosurfactant Products.

115.    A reasonable manufacturer, seller, or distributor, under the same or similar circumstances would have warned of the dangers or instructed on the safe use of the Fluorosurfactant Products.

116.    Defendants' conduct lacked any care and was an extreme departure from what a reasonable careful company would do in the same situation to prevent harm to others and the environment.

117.    Plaintiff was, is, and will continue to be harmed by Defendants' conduct.

118.    As a direct and proximate result of Defendants' above described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS

contamination of its Property, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, legal fees, and diminished property value.

### SIXTH CAUSE OF ACTION

FRAUDULENT TRANSFER (FT DEFENDANTS)

119.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

120.    Plaintiff seeks equitable and other relief pursuant to the Voidable Transactions Act against DuPont, Chemours, Chemours FC, Corteva, Inc., and DuPont de Nemours, Inc (collectively, "FT Defendants").

121.    Upon information and belief, in February 2014, DuPont formed The Chemours Company as a wholly-owned subsidiary and used it to spin off DuPont's "Performance Chemicals" business line in July 2015.

122.    Upon information and belief, at the time of the spinoff, DuPont's Performance Chemicals division contained the AFFF and/or PFAS business segments. In addition to the transfer of the Performance Chemicals division, Chemours accepted broad assumption of liabilities for DuPont's historical use, manufacture, and discharge of PFAS.

123.    Upon information and belief, at the time of the transfer of its Performance Chemicals business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries from the manufacture and sale of Fluorosurfactant Products.

124.    Upon information and belief, as a result of the transfer of assets and liabilities described in this Complaint, FT Defendants limited the availability of assets to cover judgments

for all of the liability for damages and injuries from the manufacture and sale of Fluorosurfactant Products.

125.     Upon information and belief, FT Defendants have (a) acted with intent to hinder, delay and defraud parties, or (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and (i) was engaged or was about to engage in a business for which the remaining assets of Chemours were unreasonably small in relation to the business; or (ii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

126.     Upon information and belief, FT Defendants engaged in acts in furtherance of a scheme to transfer its assets out of the reach of parties, such as the Plaintiff, that have been damaged as a result of FT Defendants' actions as described in this Complaint.

127.     Upon information and belief, FT Defendants acted without receiving a reasonably equivalent value in exchange for the transfer of obligations, and DuPont believed, or reasonably should have believed, that it would incur debts beyond Chemours' ability to pay as they became due.

128.     Plaintiff seeks to avoid the transfer of DuPont's liabilities for the claims brought in this Complaint and to hold DuPont jointly and severally liable for any damages or other remedies that may be awarded by this Court or a jury under this Complaint.

129.     Plaintiff further reserves such other rights and remedies that may be available to it as may be necessary to fully compensate Plaintiff for the damages and injuries it has suffered as alleged in this Complaint.

## **PRAYER FOR RELIEF**

Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

1. Compensatory damages according to proof including, but not limited to:

    a. costs and expenses related to the past, present, and future investigation, sampling, testing, and assessment of the extent of PFAS contamination on and within Plaintiff's Property;

    b. costs and expenses related to the past, present, and future treatment, and remediation of PFAS contamination of Plaintiff's Property;

    c. costs and expenses associated with and related to the removal and disposal of the contamination; and

    d. costs and expenses related to the past, present, and future installation, and maintenance of monitoring mechanisms to assess and evaluate PFAS on and within Plaintiff's Property.

2. Diminished property value;

3. Consequential damages;

4. Costs, disbursements, and attorneys' fees of this lawsuit;

5. Pre-judgment and post-judgment interest; and

6. Any other and further relief as the Court deems just, proper, and equitable.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a jury trial.

Dated: December 15, 2022          Respectfully submitted,

Scott Summy (TX Bar 19507500)
**BARON & BUDD, P.C.**
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219-4281
Telephone: (214) 521-3605
Fax: (214) 520-1181
Cary McDougal (TX Bar 13569600)
Carla Burke Pickrel (TX Bar 24012490)

**COSSICH, SUMICH, PARSIOLA
& TAYLOR, LLC**
8397 Highway 23, Suite 100
Belle Chasse, LA 70037
Telephone: (504) 394-9000
Fax: (504) 394-9110
Philip F. Cossich, Jr. (LA Bar 1788)
Darren Sumich (LA Bar 23321)
David A. Parsiola (LA Bar 21005)
Brandon J. Taylor (LA Bar 27662)
Christina Cossich (LA Bar 32407)
Jody J. Fortunato (LA Bar 31728)
Luana N. Smith (LA Bar 35534)

**LUNDY, LUNDY, SOILEAU & SOUTH,
L.L.P.**
501 Broad Street
Lake Charles, LA 70601
Telephone: (337) 439-0707
Matthew E. Lundy (LA Bar 18988 / TX Bar
12697300)

*Attorneys for Plaintiff*